# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIM. ACTION NO. 3:24-00072-01** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **DELANCEY KENT (01)** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a second motion to suppress [doc. # 66] filed by Defendant Delancey Kent.   For reasons stated below, it is recommended that the motion be DENIED.

### Background

On October 2, 2023, Ouachita Parish Sheriff's Deputy, Joshua Tyler Dooley ( "Dooley" or "Agent Dooley"), utilized a confidential source ("CS") to make a controlled buy of 3.5 grams of methamphetamine from Delancey Kent ("Kent") in a monitored transaction that was completed in the carport of a residence located at 1604 Parkview Drive, Monroe, Louisiana. Relying upon his own personal surveillance of the drug transaction, two video feeds of the encounter captured by electronic monitoring equipment provided to the CS, as well as the methamphetamine produced by the CS after the transaction (which laboratory testing later confirmed was methamphetamine), Agent Dooley applied for and obtained an arrest warrant for Kent on October 19, 2023.

The next day, October 20, 2023, agents proceeded to the residence to execute the arrest warrant.   Because Kent still was on probation from a prior state court drug conviction, Agent Dooley contacted Louisiana Probation and Parole ("LP&P"), who sent two of their own officers

to assist with the arrest.   After repeatedly knocking on the door for more than six minutes, LP&P Officer Phillip Roark tried the door handle, only to discover that it was unlocked.   Upon opening the door, he observed Kent standing in the kitchen and ordered him outside, where agents quickly handcuffed and Mirandized him.   Meanwhile, Officer Roark, followed closely by Agent Dooley, entered the home for the purpose of conducting a protective sweep where they saw drugs and firearms in plain view.   After advising Kent of his *Miranda* rights, agents interviewed Kent, who then admitted to selling narcotics to help pay his bills.   He further admitted that he had purchased firearms about one-to-two years earlier for safety reasons.

The agents exited the residence and obtained a search warrant for the residence, which ultimately resulted in the discovery of large amounts of marijuana, methamphetamine, cocaine, ecstasy, and prescription pills, as well as firearms and currency.

On March 27, 2024, a federal grand jury returned a five-count indictment against Kent, charging him with possession with intent to distribute methamphetamine; two counts of possession with intent to distribute controlled substances, to wit: cocaine and fentanyl; felon in possession of a firearm; and possession of firearms in furtherance of a drug-trafficking crime, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) and 18 U.S.C. §§ 922(g)(1) and 924(c). The indictment also included forfeiture allegations.   Kent was arraigned on May 1, 2024, where he entered a plea of not guilty as to all counts.

On July 15, 2024, Kent, represented by former counsel, filed his first motion to suppress all evidence associated with his October 20, 2023 arrest.   [doc. # 24].   The principal focus of that motion was the circumstances surrounding the controlled buy on October 19 and the sufficiency of the arrest warrant.   *Id*.   Following delays for briefing and a September 24, 2024 hearing, the undersigned recommended that the first motion to suppress be denied.   (Sept. 18,

2024 Report and Recommendation ("R&R") [doc. # 34]).   The District Court adopted the R&R, without objection, on October 3, 2024.   (Judgment [doc. # 35]).

Following the adverse ruling on his first motion to suppress, Kent fired his retained attorney and then a second, court-appointed attorney.   On July 1, 2025, Kent, now represented by his third attorney, filed his latest motion to suppress.   This time, Kent argues that the search warrant for his residence was invalid because Agent Dooley made material misstatements in the application, including references to the contraband that agents observed when they improperly entered his home immediately following his arrest.   Kent urges the Court to suppress all evidence and statements obtained not only as a result of the initial warrantless search of the home, but also after execution of the search warrant, which was tainted by material misrepresentations and otherwise unsupported by probable cause.

The Government filed its response to the instant motion to suppress on July 28, 2025, arguing, *inter alia*, that Kent received a full evidentiary hearing previously, and, thus, he was not entitled to a second hearing.   (Gov.'t Response [doc. # 69]).   Kent filed a reply brief on August 8, 2025.   (Def. Reply [doc. # 74]).   The Court effectively rejected the Government's argument that Kent should not get a second bite at the apple when it set the motion for hearing.   *See* E-M/Es [doc. #s 76 & 85].

A hearing was held on September 23, 2025.   The transcript of the hearing was filed in the record on November 6, 2025.   (Transcript [doc.# 93] (hereinafter, cited as "Tr.," together with the corresponding page number)).   At the hearing, the Court entertained testimony from a total of five witnesses, three called by the Government:   LP&P Officer Ethan Weeks ("Officer

3

Weeks" or "Weeks"),[1] Seth Cox ("Agent Cox" or "Cox"),[2] and Raymond Spoon ("Agent Spoon" or "Spoon"),[3] plus two by the Defense:  Agent Dooley[4] and LP&P Officer Phillip Roark ("Officer Roark" or "Roark")[5].  (Witness List [doc. # 87]).  The Court also received into evidence one exhibit from the Government:

1) October 20, 2023 video and audio footage from Agent Cox's body camera [doc. # 88-1];

(Gov.'t Exhibit List [doc. # 88]).  Together with five exhibits from Kent:

1) LP&P Narrative Report for Delancey Kent created on August 22, 2025 [doc. # 89-1];

2) May 2, 2022 Probation Judgment in *State v. Kent*, No. 21CR2453 (4th JDC) [doc. # 74-1;

3) October 24, 2023 DEA Report of Investigation by Agent Seth Cox [doc. # 89-2]

4) October 20, 2023 video and audio footage from Agent Dooley's body camera [doc. # 89-3]; and

5) October 20, 2023 Search Warrant and Application for 1604 Parkview Drive, Monroe, Louisiana [doc. # 74-2].

---

[1] Ethan Weeks has served as an officer with LP&P since 2013.  (Tr. 4-5).  At the time of the hearing, he was a supervisor and arrest coordinator for the Monroe office.  *Id.*

[2] Seth Cox has served as a deputy with the Ouachita Parish Sheriff ("OPSO") since 2009.  (Tr. 31).  On October 20, 2023, and at the time of the hearing, he was assigned as a task force officer with the Drug Enforcement Administration ("DEA") in Monroe, Louisiana.  (Tr. 31-32).  He has conducted hundreds of narcotics investigations over the years.  *Id.*

[3] Raymond Spoon is a corporal with the West Monroe Police Department, assigned to the investigative division for the past twelve years and Metro Narcotics Unit ("Metro Narcotics") for the past four years.  (Tr. 66-67).

[4] Agent Dooley is employed by the OPSO and, as of October 2023, had been assigned to Metro Narcotics for three years.  (Tr. 84-85).  At the time of the hearing, he was assigned as a task force officer with the DEA.  *Id.*  Dooley was the lead agent in this case.  (Tr. 85-86).

[5] Phillip Roark is an officer with LP&P, where he has worked for a little over six years.  (Tr. 108).  He obtained his POST certification in December 2019.  *Id.*

4

(Def. Exhibit List [doc. # 89]).

Kent and the Government filed post-hearing memoranda on November 13 and 19, 2025, respectively.   [doc. #s 94-95].   Accordingly, the matter is ripe.

### Relevant Testimony and Documentary Evidence

Pursuant to Kent's first motion to suppress, the Court found that Agent Dooley began an investigation of Kent after law enforcement received information that he was selling narcotics in Ouachita Parish.   *See* R&R [doc. # 34].   The Court incorporates those findings here:

On October 2, 2023, agents met with a confidential source ("CS") who had made prior arrangements with Kent to purchase methamphetamine.[6]   Agent Dooley observed the CS make contact with Kent, consummate the transaction, and then depart.   Two unidentified males also were present during the transaction, one sitting outside and one that exited the house.   On October 3, 2023, Agent Dooley sent the suspected methamphetamine from the transaction to the North Louisiana Criminalistics Laboratory ("NLCL") for analysis.   (Affid. for Arrest Warrant; Gov.'t Response, Exh. [doc. # 25-1]).   On October 18, 2023, Dooley received a report from the NLCL confirming that the substance purchased from Kent was methamphetamine.   *Id.*

On October 19, 2023, with the newly obtained NLCL report in-hand, Agent Dooley applied for an arrest warrant for Kent on counts of distribution of CDS II (methamphetamine) and for violation of a drug free zone in violation of Louisiana Revised Statutes §§ 40:967 and 981.3.   *Id.*   In the warrant application, Dooley averred that the CS had advised him that Kent lived at 1604 Parkview Drive, Monroe Louisiana.   *Id.*   Furthermore, on October 2, 2023, agents observed Kent *exit the residence* at 1604 Parkview Drive, Monroe, Louisiana, where he made

---

[6] Another agent had obtained corroborating information from an independent source that Kent was selling narcotics.

contact with the CS beneath the carport and exchanged 3.5 grams of suspected methamphetamine for agency-provided funds.   *Id*.   The residence is located within 770 feet of Wossman High School.   *Id*.   That same day, October 19, 2023, the Honorable Larry D. Jefferson of the Fourth Judicial District Court, for the Parish of Ouachita, State of Louisiana, issued a warrant for Kent's arrest at 1604 Parkview Drive, Monroe, Louisiana.   (Arrest Warrant [doc. # 25-1]).

The Court supplements its findings from the initial motion to suppress with the additional evidence and testimony received pursuant to the second motion:   as the lead agent in the case, Dooley decided to execute the arrest warrant on October 20, 2023, the day after it was issued. (Tr. 86).   To assist with the arrest, Agent Dooley rounded up several Metro Narcotics agents who were present that morning, including Agents Cox, Spoon, and Mahoney.   (Tr. 86-87). Dooley believed that four agents was sufficient to execute the warrant, but, for safety reasons, it is best to have as many agents as possible.   *Id*.[7]

Dooley reached out to LP&P to determine whether Kent still was assigned to them.   (Tr. 88-90).   He spoke with Officer Weeks, because he was a supervisor, and learned that Kent still was on probation for a drug charge at that time.   (Tr. 6).   Once Dooley confirmed that Kent still was under LP&P supervision, he asked them if they wanted to come along.   (Tr. 88-90). Dooley explained that he called LP&P as a courtesy, and LP&P indicated that they wanted to assist with the warrant.   *Id*.[8]

---

[7] Agent Cox also wanted to have as many agents as he could get to effectuate an arrest warrant. (Tr. 51-52).

[8] Dooley testified that he knew that LP&P had the right to conduct warrantless searches of individuals who were under their supervision.   (Tr. 88-89).   However, he denied bringing LP&P along so they could search the home.   (Tr. 89).

LP&P Officer Weeks testified that when an arrest warrant has been obtained for someone on probation or parole, his office is typically notified.   (Tr. 6-7).   Jalilah Wheeler was the probation officer assigned to supervise Kent.   *Id*.   However, she was unavailable on October 20, 2023, and so, per their practice, Weeks temporarily assigned Officer Roark to Kent's case. (Tr. 7-8).   Roark works warrants for their office and handles a lot of temporary assignments. *Id*.

Weeks explained that when a case is temporarily reassigned to another officer it is documented via a case narrative, which was done here.   (Tr. 7-8, 18-19); Def. Exh. 1.   The narrative report confirms that the case was assigned temporarily to Officer Roark for the purpose of assisting MNU with an arrest warrant.   (Tr. 19-20); Def. Exh. 1.   A temporarily assigned officer includes all of the duties of a probation officer.   (Tr. 19).

Weeks denied that there was any discussion that, as probation officers, they were authorized to search Kent's residence without a warrant.   (Tr. 20).[9]   However, one of the conditions set forth in Kent's probation judgment was that he waived search warrant requirements for his person, vehicle, property, residence, or personal effects in accordance with Louisiana Code of Criminal Procedure Article 895(13)(a), which the judgment quoted as:

> [a]gree[s] to searches of his person, his property, his place of residence, his vehicle, or his personal effect, or any or all of them, at any time, by the Probation Officer or the parole officer assigned to him, with or without a search warrant, when the probation officer or the parole officer has reasonable suspicion to believe that the person who is on probation is engaged in or has been engaged in criminal activity.

---

[9] A residence or compliance check entails an officer going to the probationer's house and walking around to make sure there are no violations.   *Id.*

(Tr.22; Def. Exh. 2).[10]   Other conditions set forth in Kent's probation judgment prohibited Kent from possessing firearms and any narcotics, drugs, or other controlled substances.   *Id*.

Officer Weeks received the call from Agent Dooley less than two hours before they went to Kent's residence.   (Tt. 15-16).   The agents and officers had a meeting beforehand to discuss how they would effectuate the arrest and decided that Officers Roark and Weeks would walk up the driveway because it was more common for probation officers to go to a house to check on the subjects they were supervising.   (Tr. 15-16, 92).   Furthermore, the probationer is more likely to come outside because it is common for LP&P to go their residence.   *Id*.   Similarly, the agents did not announce who they were initially, because they sometimes achieved a better result by not yelling, "Police."   (Tr. 25).

According to the timestamp on the video footage, six officers arrived at 1604 Parkview Drive at 10:10 a.m.   (Cox Body Cam.).   When they arrived, there was a vehicle in the driveway, but no one was outside.   (Tr. 9).   Officers began knocking at the carport door within fifteen seconds of arrival.   (Cox Body Cam.).   Weeks watched the rear of the residence, while four agents were at the front.   *Id*.   They knocked several times and, within a couple of minutes,

---

10 In 2017, the Louisiana Supreme Court determined that the prior version of Article 895(13) quoted in Kent's probation judgment, did not encompass a temporarily assigned officer.   *State v. Brignac*, 234 So.3d 46, 61-62 La. 2017), *overturned due to legislative action.*   Thus, the court held that the search violated Article I, § 5 of the Louisiana Constitution.   *Id*.   The following year, however, the Louisiana legislature passed Act 2018, No. 351 to overrule *Brignac*, by amending Article 895(13) to clarify that a probationer agrees to warrantless searches of his residence, etcetera, not only by the probation or parole officer assigned to him, but also to an officer subsequently assigned to him whether the assignment or directive is temporary or permanent.   *See* LA. CODE CRIM. P. ART. 895(13)(a) (current).

an agent also started knocking on the front door, while Agent Cox yelled into a closed window. *Id*. An agent is heard yelling, "Police, come to the door!".

According to Weeks, officers were present for between seven and ten minutes before anyone responded. (Tr. 9). Eventually, Officer Roark tried the front door and found it unlocked. (Tr. 9-10). Prompted by Weeks, Roark opened the door and saw Kent standing in the kitchen area. *Id.*

Weeks testified that Kent exited the residence and was taken into custody by Agent Spoon. (Tr. 10; *see also* Tr. 69). Spoon testified that when Kent came out, he placed Kent in handcuffs and read him his *Miranda* rights. *Id*. Kent told Spoon that there was marijuana in the house and a firearm. (Tr. 70). Spoon agreed, however, that agents were already inside the house when he had the discussion with Kent about the marijuana and the gun. (Tr. 79).

Officers cleared the home for their safety but found no one else inside the home. *Id*. Dooley's body camera confirms that. as soon as Kent exited the home, Roark passed him off to Agent Spoon and entered the home with his firearm drawn. (Dooley Body Cam, 7:42 ). Roark can be seen standing with his firearm pointing towards the inside of the residence. *Id*. Agents twice asked Kent whether there was anyone inside the residence and received denials both times. *Id*., at 8:05. Within 30 seconds after taking Kent into custody, Agent Dooley followed Officer Roark into the home. *Id*., at 8:10. The video depicts Dooley holding his service weapon in front of him. *Id*., at 8:30. In less than one minute, Roark and Dooley spotted drugs and contraband in plain view. *Id*. at 8:49.[11] The agents swept the remainder of the home for anyone

---

[11] Weeks went through the kitchen and ended up in the living room, where he observed a gun "leaning up" and methamphetamine on the couch. (Tr. 11).

else.   A little more than two minutes after entering, Dooley exited the home and consulted with Agent Cox.   *Id.*, at 10:29.   Dooley told Cox what they had observed in the home, whereupon Cox told him to "write a search warrant."   (Cox Body Cam, 11:05).

Cox then followed Dooley back inside the home.   *Id.* at 11:23.   Cox asked the agents whether there was anyone else there.   *Id.*, at 11:29.   Officer Weeks replied that there was no one else there, unless they were hiding.   *Id.*   Weeks and Roark then showed Cox the location in the home where they had spotted the drugs and gun(s).   *Id.*, at 11:55.   Cox then exited the home.   *Id.*, at 12:11.

Weeks stated that he and Roark entered the residence to clear the residence for officer safety.   (Tr. 26).   They thought Kent's parents could be there.   (Tr. 27).   Weeks explained that agents typically will enter a residence and clear it once someone exits the home.   (Tr. 10). When asked whether he thought that the parents could pose a threat, Weeks replied that it was standard practice to clear a house for officer safety purposes.   (Tr. 26-27).   Weeks added that, when they arrest a suspect on a felony warrant at a house, there always is a possibility of someone else in the house.   *Id.*[12]

Agent Dooley had prior knowledge that Kent lived with his mother and father.   (Tr. 90). Furthermore, during the controlled purchase that was conducted earlier that month, he observed two other individuals at the residence.   *Id.*   Dooley did not know whether they lived there, but

---

[12] Agent Cox testified that until he knows that no one else is in the home, he is going to treat the scene as if there is someone inside.   (Tr. 63-64).   Cox was unable to identify any specific facts to suggest that there was a reasonable possibility that someone else was in the home.   (Tr. 63-64).

he had seen them there on the day of the buy and so did not know whether they would be there the day they executed the warrant.  (Tr.  90-91).

Officer Roark testified that he entered the residence for the sole purpose of conducting a protective sweep.  (Tr. 113-114).  However, he did not observe anything to suggest that there were other people in the residence.  (Tr. 112-113).  For his part, Agent Dooley thought that Roark entered the home to conduct a compliance check.  (Tr. 96).  Accordingly, Dooley accompanied the LP&P officers for safety reasons to make sure nothing happened to them.  (Tr. 104-106).

Agent Dooley wrote the affidavit for the search warrant, stating that,

[o]n 10/20/2023, Metro Narcotics Unit arrived at 1604 Parkview Drive Monroe, LA 71202 to assist Louisiana Probation and Parole agents with serving an arrest warrant on Delancey Kent for distribution of methamphetamine.  Upon arrival P&P Agents contacted Kent at the carport door of the residence.  Kent was secured in handcuffs and advised of his rights per Miranda to which Kent stated he understood.  During a post Miranda interview, Kent stated he had narcotics and firearms inside the residence.  P&P Agents then conducted a residence check and observed firearms and a large amount of suspected narcotics in the living room. Agents then stopped and secured the residence until a search warrant could be obtained.  Your affiant is requesting a narcotics warrant to further this narcotics investigation.

(Oct. 20, 2023 Search Warrant and Application for 1604 Parkview Drive, Monroe, Louisiana [doc. # 74-2] and (Tr. 104)).  The Honorable Larry Jefferson, the same judge who issued the arrest warrant for Kent one day earlier, signed the search warrant on October 20, 2023, at 11:08 a.m.  *Id*.

Agent Dooley admitted that the chronological order of events in his warrant affidavit was incorrect.  (Tr. 101).  In fact, agents entered the home *before* Kent made any statements

regarding marijuana or firearms in the home. *Id.* Dooley conceded that he made an unintentional error. (Tr. 105).

The subsequent search of the residence resulted in the discovery of large amounts of marijuana, methamphetamine, cocaine, ecstasy, and prescription pills, plus firearms and currency. *See* Oct. 24, 2023 DEA Report of Investigation by Agent Seth Cox [doc. # 89-2].

After advising Kent of his *Miranda* rights, agents interviewed Kent, who then admitted to selling narcotics to help pay his bills. He further admitted that he had purchased firearms about one to two years earlier for safety reasons.

## Law and Analysis

### I.    Fourth Amendment Principles

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979). "A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted).

Generally, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure. This prohibition applies as well to the fruits of the illegally seized evidence." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct: by refusing to admit

12

evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). However, the exclusionary rule is not without limits and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*

Kent contends that, following his arrest, agents proceeded to conduct a warrantless search of the residence at 1604 Parkview Drive in violation of the Fourth Amendment. In response, the Government argues that agents entered the home pursuant to the protective sweep exception to the warrant requirement, and, in any event, LP&P Officer Roark was authorized to search the home pursuant to Kent's status as a probationer. The Court agrees.

As an initial matter, the Court recognizes that there is some disagreement between the LP&P officers and the Metro Narcotics agents regarding the purpose of the initial entry to Kent's residence. While the LP&P officers said they entered the home to conduct a protective sweep, Agent Dooley said he entered the home to assist the LP&P officers with their "compliance check." However, Officer Roark was the officer inside the home initially, and he led the procession through the home. Accordingly, the Court credits Roark's rationale for the entry, i.e., a protective sweep.

## II.    Protective Sweep Exception

"[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands [one's] right . . . to retreat into [one's] own home and there be

13

free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Nonetheless, one of the exceptions to the warrant requirement is the protective sweep doctrine. *United States v. Turner*, 125 F.4th 693, 708 (5th Cir. 2025) (citation omitted). "A protective sweep is a quick and limited search of premises . . . conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (internal quotation marks omitted).[13] "Once the officers are legally inside the [residence], any evidence or contraband that is in plain view is subject to seizure and may be admitted into evidence." *United States v. Jackson*, 700 F.2d 181, 189 (5th Cir. 1983) (citing *Harris v. United States,* 390 U.S. 234, 236 (1968)).

A valid protective sweep requires the following:

First, the police must have entered legally and for a legitimate law enforcement purpose.

Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene.

Third, the protective sweep must be limited to a cursory inspection of only those spaces where a person may hide; it is not a full search of the premises.

Finally, officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

*United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008) (citing *United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004)) (footnotes removed).

---

[13] However, there is no "general security check" exception to the warrant requirement. *Kirkpatrick v. Butler*, 870 F.2d 276, 281 (5th Cir. 1989) (citation omitted).

When assessing whether a protective sweep is justified, the court considers the totality of the circumstances surrounding the officers' actions.   *United States v. Silva*, 865 F.3d 238, 241–42 (5th Cir. 2017) (citation omitted).   Ultimately, however, "[i]f reasonable minds could differ on [ ] whether the sweep was warranted, [the court will] not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation."   *Id*. (citation omitted).

Applying the requirements for the exception to the facts of this case, the Court finds that the officers and agents were at the 1604 Parkview Drive residence to execute an arrest warrant for Kent, which is a legitimate law enforcement purpose.   Furthermore, even though they quickly removed Kent from the residence and took him into custody, they were permitted to legally enter the residence either for the purpose of conducting a protective sweep or to search the home as a result of Kent's probation status.   *See Silva*, 865 F.3d at 242-243 (officers legally entered trailer to conduct a protective sweep after taking suspect into custody outside the trailer) and discussion, *infra*.

As for the exception's second requirement, the Court recognizes that there was some evidence that the officers and agents entered the home pursuant to standard operating procedure. For example, Officer Weeks testified that it was standard practice to clear a house for officer safety purposes.   (Tr. 26-30).   Furthermore, Agent Cox stated that until he knows there are no other individuals in a home, he is going to treat the scene as if there are others present.   (Tr. 63). Finally, Agent Dooley acknowledged that if they "secure a residence, it is customary to clear it, make sure there are no people present."   (Tr. 103).

15

Nonetheless, the agents did have a reasonable, articulable suspicion that the area to be swept harbored someone who might pose a danger to the officers.   Indeed, prior to the sweep, the officers and agents discussed the fact that Kent lived with his parents.   (Tr. 17).   While, apart from a vehicle parked in the driveway, there were no sounds, signs, or other intelligence to suggest that Kent's parents were home at the time of the arrest, the officers nonetheless thought the parents would be present at the residence.   (Tr. 26-27).   Furthermore, despite the likely age of Kent's parents, officers believed that they still could be a threat to safety.   (Tr. 98).   In addition, Agent Dooley had observed other individuals who were present at the residence during the controlled buy earlier that month.   (Tr. 90-91).

In *United States v. Thurman*, the Fifth Circuit found that officers had a reasonable, articulable suspicion that an apartment harbored a potentially dangerous individual based on a statement from a child that someone was inside the apartment, *United States v. Thurman*, No. 21-30450, 2022 WL 2805147, at *4 n.6 (5th Cir. July 18, 2022).   Although a woman ended up exiting the apartment before the sweep and officers did not hear noises or see movements suggesting that anyone else was inside, the Court emphasized that the police had no way of knowing whether someone else besides the woman was inside the apartment.   *Id*.

Similarly, in *United States v. Silva*, the Fifth Circuit found that a protective sweep of the inside of defendant's trailer was justified where officers executed an arrest warrant for the defendant outside his trailer, the defendant did not exit the trailer for more than one minute, there was no indication that anyone else was inside the trailer, but, based on the officers' experience, they were concerned for their safety and could not be certain that no else was inside.   *United States v. Silva*, 865 F.3d 238, 242 (5th Cir. 2017).

16

In addition, the Fifth Circuit has upheld a protective sweep where the officer who made the protective sweep conceded that "he lacked specific reason to believe other individuals were in the house but that the possibility always exists." *United States v. Watson*, 273 F.3d 599, 601 (5th Cir. 2001). In another decision, the Fifth Circuit found no Fourth Amendment violation where the DEA agent conducted a security check of a motel room when the defendant was arrested outside the front door, and the agent had a reasonable, but unarticulated suspicion that someone else might have remained in the motel room. *United States v. Sheikh*, 654 F.2d 1057, 1072 (5th Cir. 1981), *overruled on other grounds by United States v. Zuniga-Salinas*, 952 F.2d 876 (5th Cir. 1992)). Likewise, in *United States v. Jackson*, the Fifth Circuit found that agents had a reasonable belief that an immediate security sweep of the premises was required because they did not know whether the two suspects who had left the room were the only remaining people involved in the exchange. *United States v. Jackson*, 700 F.2d 181, 190 (5th Cir. 1983).

In still another decision, the Fifth Circuit held that where the defendant was arrested just outside of his home, a protective sweep was permissible to dispel the possibility that another individual was inside the home who might pose a threat to the officer's safety. *United States v. Stout*, 339 Fed. App'x. 377, 378 (5th Cir. 2009) (citations omitted). Finally, the Fifth Circuit found no Fourth Amendment violation where officers decided to conduct a sweep of a storage unit to allay their "concern" that someone else might be hiding there, even though the defendant was arrested outside of the storage unit. *United States v. Charles*, 469 F.3d 402, 406 (5th Cir. 2006).

Kent emphasizes that the officers appeared to be relaxed in the body cam footage, prior to encountering him inside the home, belying any alleged safety concerns. However, the officers'

individual behavior is not dispositive.    Moreover, once the officers discovered that Kent was in the home, their demeanor changed immediately and they displayed a heightened state of urgency and awareness.    Also, when Officer Roark entered the home to clear it, he had his firearm drawn and pointed in front of him.    Agent Dooley likewise displayed his weapon, at the ready, as he followed Roark.

In *United States v. Thurman*, a Monroe police officer stood with his back to an apartment's entryway for minutes on end before finally electing to enter the apartment to conduct a protective sweep after agents were unable to obtain consent to search the home.    *Thurman*, 2022 WL 2805147, at *1.    While acknowledging that an officer's "behavior [can] objectively reveal[ ] a purpose to conduct a search," the Fifth Circuit focused instead upon the fact that the officer had drawn his firearm during the sweep, which would have been unnecessary if he truly was unconcerned for his safety.    *Id*.    Here, of course, Officer Roark had his firearm drawn as he swept the home, with other officers providing backup.

In short, the Court finds that the officers had a reasonable, articulable suspicion that 1604 Parkview Drive potentially harbored an individual who could have posed a danger to the on-scene officers.    *Thurman*, 21-2022 WL 2805147, at *4.

As for the remaining requirements for the sweep, the Court finds that the sweep was limited to areas where an individual could have hidden and lasted no longer than necessary.    The body camera footage confirms that the officers looked inside the rooms where someone could be present.    The sweep lasted but a few minutes, and the officers appeared to exit the home upon completion.    Of course, while checking a room for individuals, officers observed contraband

18

and firearms in plain view.   Armed with this additional evidence, Agent Dooley applied for a search warrant.   *See* discussion, *infra*.

In the end, where, as here, reasonable minds could differ as to whether the sweep was warranted, the Court will "not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation."   *Thurman*, 2022 WL 2805147, at *3 (quoted source omitted).   Therefore, the Court finds that the protective sweep did not transgress the Fourth Amendment.

However, even if the protective sweep exception to the warrant requirement did not apply, and the LP&P officers effectively conducted a warrantless search of Kent's home, there still was no Fourth Amendment violation because Kent was on probation and they had a reasonable suspicion that he was engaged in criminal activity.   *See* discussion, *infra*.

## III.    Probationer – Reasonable Suspicion Exception

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."   *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoted source and internal quotation marks omitted).   "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.'"   *Id*. (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)).   Thus, "probationers . . . do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions."   *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quoted source and internal quotation marks omitted).

19

In *Griffin*, the Court

> upheld a search of a probationer conducted pursuant to a Wisconsin regulation permitting "any probation officer to search a probationer's home without a warrant as long as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband." The Wisconsin regulation that authorized the search was not an express condition of Griffin's probation; in fact, the regulation was not even promulgated at the time of Griffin's sentence.

*Knights*, 534 U.S. at 117 (citing *Griffin*, 483 U.S. at 870–871) (internal citation omitted).

In *Knights*, the Court held that a detective's warrantless search of the probationer's apartment for evidence of a separate crime, that was supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment. *Knights*, 534 U.S. at 111-112. Therefore, a warrant was unnecessary. *Id*. The Court added that it remained "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id*. (citing *Whren v. United States,* 517 U.S. 806, 813 (1996)).

Considered together, *Griffin* and *Knights* establish that a law enforcement officer may conduct a warrantless search of a probationer's home when he or she has reasonable suspicion that it contains contraband or evidence of a crime, and the search is authorized by a regulation *or* a condition of probation. The Fifth Circuit has stated that it was unable to "read *Knights* or *Griffin* as requiring either a written condition of probation or an explicit regulation permitting the search of a probationer's home on reasonable suspicion." *United States v. Keith*, 375 F.3d 346, 350 (5th Cir. 2004). Instead, it concluded that "a warrantless search of a probationer's home was justified based on nothing more than a probation officer's reasonable suspicion that the probationer had engaged in conduct that had violated or was about to violate the terms of his probation." *Keith*, 375 F.3d at 348. Of course, "reasonable suspicion" means "a particularized

and objective basis for suspecting the particular person" of wrongdoing.   *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998).

Applying the foregoing principles here, the Court observes that the LP&P officers not only had reasonable suspicion, but probable cause to believe that Kent was engaged in conduct that violated the terms of his probation because they were helping to execute an arrest warrant for Kent for distribution of methamphetamine.   Therefore, insofar as the protective sweep is more accurately characterized as a warrantless search of the home, as Kent contends, the search did not transgress the Fourth Amendment.   *See Keith*, 375 F.3d at 348.

Furthermore, by law, Kent consented to a search of his residence by his temporarily assigned probation officer, when, as here, the officer had reasonable suspicion to believe that the probationer was engaged in criminal activity.   LA. CODE CRIM. P. ART. 895(13)(a).[14]   Here, Officer Roark was temporarily assigned to supervise Kent at the time of his arrest and the associated "search."   Accordingly, the alleged warrantless search of Kent's residence did not violate the Fourth Amendment.   *Knights*, 534 U.S. at 111-112; *Griffin*, 483 U.S. at 870–871.

## IV.   The Search Warrant

Kent contends that the search warrant was premised upon an affidavit that included material misrepresentations.   The Fifth Circuit has recognized that,

[u]nder the Supreme Court's decision in *Franks*, a search warrant must be voided

---

[14]  While Kent contends that the terms of his probation judgment should govern who could be assigned to supervise him, the Court observes that the judgment does not preclude a different officer being assigned or temporally assigned to supervise him.   At the time of Kent's sentencing, Article 895(13) had been amended to specify that the probationer agrees to a warrantless search even by an officer who is temporarily assigned to supervise him.   Moreover, in *Griffin*, the state regulation that authorized the search was not a condition of Giffin's probation and was not promulgated until later.   *Knights*, 534 U.S. at 117 (citing *Griffin*, 483 U.S., at 870-871).

if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause.

*United States v. Ortega*, 854 F.3d 818, 825 (5th Cir. 2017) (citing, *inter alia*, *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

Typically, a motion to suppress evidence discovered pursuant to a search warrant is analyzed under a two-step process. *United States v. Sibley*, 448 F.3d 754, 757-758 (5th Cir. 2006) (citation omitted). First, the court must decide whether the good-faith exception to the exclusionary rule applies. *Id.*[15] If this good faith exception applies, then the inquiry ends. *Gibbs*, 421 F.3d at 357 (citation omitted). If the good-faith exception does *not* apply, then the court must proceed to the second step of the analysis to determine whether the warrant was supported by probable cause. *Gibbs*, 421 F.3d at 357.

In *Ortega*, the Fifth Circuit explained that the *Franks* inquiry effectively consists of three questions, all of which must be met: "First, does the affidavit contain a false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?" *Ortega*, 854 F.3d at 826 (internal citations omitted).

_____

[15] "'The good-faith exception provides that where probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be excluded.'" *Sibley,* 448 F.3d at 757 (quoting *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002)). Because the exclusionary rule is designed to deter misconduct rather than to punish the errors of judges and magistrates, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant relied on it in good faith." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted). The government bears the burden of demonstrating that the good faith exception applies. *United States v. Gant*, 759 F.2d 484, 487 (5th Cir. 1985).

Under a *Franks* analysis, "material omissions are treated essentially similar to claims of material misstatements." *United States v. Gonzalez*, Civ. Action No. 18-0482, 2018 WL 6174202, at *7 (S.D. Tex. Nov. 7, 2018), *R&R adopted,* 2018 WL 6173724 (S.D. Tex. Nov. 26, 2018) (citations omitted). Moreover, the defendant must show more than mere "negligence or innocent mistake" by the affiant. *United States v. Ortega*, 719 Fed. App'x. 319, 323–24 (5th Cir. 2018) ("*Ortega II*") (citations omitted). However, "recklessness may be shown circumstantially 'when reasons to doubt [the] information's veracity are obvious.'" *Id.*, at 324-25 (citations omitted).

Finally, probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). A magistrate requires only a substantial basis for concluding that a search will uncover evidence of wrongdoing. *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citation omitted).

Kent emphasizes that the chronology set forth in the affidavit is incorrect because the sweep and/or search of the home occurred before Kent admitted that there was firearms and narcotics in the home. Kent suggests that, without his admission that there was contraband in the home, there was no probable cause or grounds for the officers to sweep or search the home. Therefore, Kent proposes to strike from the affidavit not only his statement that there were firearms and drugs in the home, but also the ensuing sentence that, "P&P Agents then conducted a residence check and observed firearms and a large amount of suspected narcotics in the living room."

23

However, only the second sentence was arguably misleading and out of sequence.   If that sentence is excised from the affidavit, Kent's admission to the agents provides ample probable cause for the search warrant.   Furthermore, there was no need to detail the second sentence in the affidavit because there was no Fourth Amendment violation when the agents conducted a protective sweep or, alternatively, a search based on reasonable suspicion by his temporarily assigned probation officer.   *See* discussion, *supra*.

In addition, there is no evidence that the errors in the affidavit were anything other than an innocent mistake(s) by Agent Dooley.   In fact, the day before he obtained the search warrant for 1604 Parkview Drive from the Honorable Larry Jefferson, Agent Dooley had submitted an affidavit for an arrest warrant for Kent to the same judge, wherein Dooley averred that he had seen Kent exit the residence, i.e., 1604 Parkview Drive, and, while standing in the carport, exchange 3.5 grams of suspected methamphetamine for $50.   *See* Affidavit for Arrest Warrant [doc. #25-1].   In other words, Dooley already had probable cause to obtain a search warrant for the residence when he applied for the arrest warrant, one day earlier.   Dooley opted not to seek a search warrant at that time, which suggests cautiousness or oversight, not recklessness or an intent to deceive.

In sum, the Court finds no constitutional violation associated with the application for, and the issuance of the search warrant for 1604 Parkview Drive.

## V.    **Incriminating Statements**

Apart from seeking suppression of all evidence and statements that were the product of the sweep/search of his home, both pre- and post-warrant, Kent's motion does not otherwise address the suppression of any incriminating statements.   Moreover, Kent does not contend that

any statement he made, all of which apparently were uttered post-*Miranda,* were not freely and voluntarily conveyed.   In the absence of any alleged *Miranda* or cognizable constitutional violations, the Court necessarily concludes that there is no basis to suppress any of Kent's statements.   *United States v. Needham*, Cr. No. 11-185, 2011 WL 13124280, at *8 (W.D. La. Oct. 26, 2011), *aff'd,* 546 Fed. App'x. 353 (5th Cir. 2013); *see also United States v. Pace*, 955 F.2d 270, 278 n.9 (5th Cir. 1992) (denial of the motion to suppress evidence seized at defendant's barn also disposes of his argument that the statements he made after the search of the barn and his arrest were inadmissible at trial).

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that Defendant Delancey Kent's second motion to suppress [doc. # 66] be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL**

**BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM**

**ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS**

**AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 5th day of January, 2026.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

26